IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ANNA C. MOORE
a minor child, by and through her
mother and natural guardian Pamela
Moore,

    Plaintiff,

      v.

DAVID COOK
in his official capacity as
Commissioner of the Department of
Community Health,

    Defendant.

CIVIL ACTION FILE
NO. 1:07-CV-631-TWT

ORDER

This is an action for injunctive and declaratory relief.  This Order constitutes my findings of fact and conclusions of law resulting from the non-jury trial of this case on March 19 and 20, 2012.  The case proceeded to trial pursuant to the mandate of the Court of Appeals.  At the final pretrial conference, the parties all agreed that the scope of the trial would be limited to Callie Moore's need for skilled nursing services in the period from October, 2006 to the filing of the lawsuit in March, 2007.

I. <u>Findings of Fact</u>

1.      Since 1998, when she was three years old, the Plaintiff Callie Moore has received Medicaid-funded nursing services from Georgia's Department of Community Health ("the Department") and its predecessor agencies.  Under the Medicaid Act, a participating state is required to provide certain categories of care to eligible children, including early and periodic screening, diagnostic and treatment services ("EPSDT").  In Georgia, a child who is enrolled as a member of the Georgia Pediatric Program[1] is eligible to receive private duty nursing services.[2]  While the Plaintiff has been enrolled in the Georgia Pediatric Program, the Department has approved her to receive private duty nursing services in her home.  On November 15, 2006, the Department notified the Plaintiff that her hours of approved skilled nursing services were being reduced from 94 to 84 hours per week effective December 7, 2006.  Through her mother, she immediately appealed this reduction, and a hearing was scheduled.  The day before

---

[1]This is a Georgia Medicaid program that provides continuous skilled nursing care to medically fragile children.  It is referred to as "GAPP."

[2]Private duty nursing services is defined as "nursing services for recipients who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility."  42 C.F.R. § 440.80.  These services are provided by a registered nurse or nurse practitioner under the direction of the recipient's physician at either the recipient's home, a hospital, or a skilled nursing facility.  <u>Id.</u>

the hearing, however, she withdrew her request and filed this section 1983 action, seeking declaratory and injunctive relief against the Department.

2.      Callie is a seventeen year old Medicaid beneficiary living in her mother's home in Danielsville, Georgia.  Due to a stroke she experienced in utero, the Plaintiff is severely disabled and suffers from a host of chronic conditions, including spastic quadriplegic cerebral palsy, refractory seizure disorder, mental retardation, gastroesophageal reflux disease, cortical blindness, dysphagia, bone cartilage disease, scoliosis, kyphosis, and restrictive lung disease.  In summary, she has severe physical disabilities including spinal deformities in two directions, she is blind and non-verbal, she has seizures that are difficult to control, she has difficulty swallowing even her own saliva, she has difficulties with breathing consistently, she is cognitively impaired, and she has a host of other physical manifestations and medical complications as a result of the damage to her brain.

3.      Callie's primary treating physician is Dr. Charles Braucher.  He is board certified in pediatrics, internal medicine and hospice care.  (T. Tx. p. 61).[3] He testified in person at the trial.  Dr. Braucher impressed me as an extraordinarily competent and caring physician.  He was an extremely credible witness.  Dr. Braucher has been treating Callie since she was four months old.  (T. Tx. p. 62).  She was severely brain

---

[3]Citations to the trial transcript will be indicated as "(T. Tx. p.  )."

damaged by a stroke that occurred in utero. (T. Tx. p. 65). The stroke resulted in the death of the middle portion of her brain and left other portions of her brain not functioning well. (T. Tx. p. 65). She has cortical blindness. She can make sounds but is unable to speak intelligibly in any way. She has painful flexion contractures affecting her wrists, elbows, knees and hips. This leads to all sorts of problems with skin break down, hard to turn, hard to dress, hard to change and hard to fit in a chair. She cannot swallow and has to be fed through a feeding tube in her stomach. (T. Tx. p. 66). She is very prone to gastroesophageal reflux. Her stomach does not empty well, so she has to be fed slowly. Because she cannot swallow, she is prone to aspiration which sets her up for wheezing, asthma-like conditions and recurrent pneumonias. Because she cannot keep her body straight with her muscles, she developed scoliosis – curvature of the spine – and kyphosis – leaning forward – and her torso is twisted. (T. Tx. p. 67-68). These conditions were obvious and pronounced when the child was in the courtroom during the trial. She has epilepsy and frequent seizures. She has multiple types of seizures which leads to multiple types of medications, constant monitoring of the medicines and adjusting the medicines. She has difficulty emptying her bladder. This requires monitoring and catheratization. Her autonomic nervous system does not work well. So she has fevers, sweating and goes for days without sleeping. (T. Tx. p. 68-69). She is

emotionally unstable, laughing and crying for no apparent reason.  She is incontinent and that has to be monitored closely.  Her bones have never gotten very strong and she has osteoporosis.  This makes her prone to fractures when she is moved.  (T. Tx.  p. 69).  She sees a pulmonologist, a gastroenterologist, a neurologist who specializes in epilepsy, an orthopedist, a gynecologist, an endocrinologist and a rehab doctor.  (T. Tx. p. 70).

4.     Dr. Braucher testified that 2006 was a bad year for her respiratory problems.  She had recurrent sinus infections and recurrent episodes of bronchitis.  She was having more seizures.  She was having episodes of pain of undetermined origin.  She began menstruating and that was complicating things because of the hormonal changes.  In that time frame she had a "terrible" episode of diarrhea that went on for months.  This was very "problematic" in terms of her skin care.  (T. Tx. p. 63).  Dr. Braucher saw her in December of 2005, February, March, April, June and October of 2006, and February of 2007.  She was hospitalized at Athens Regional  and at least once at Egleston in 2006.  (T. Tx. p. 71).

5.     Dr. Braucher testified that the medical conditions that he described do not change.  "But the intensity of the conditions and how they are expressed changes from day to day. For instance, her seizures she may go a week where she has one a day and then she may go three days where she has ten a day. So her -- each individual problem

is intermittently unstable. But the overall, all those chronic problems I just listed stay. They don't go away. They are chronic." (T. Tx. p. 72). She is not getting better. (T. Tx. p. 72). "She has potential to deteriorate in all -- well, a lot of those areas. Her respiratory status, you know, the more infections she has, the more scarring in the lungs occurs making her lung function worse. Her musculoskeletal deformities with the kyphosis and all that, if they get worse that'll inhibit her respiratory function making it harder for her to breathe. Her seizure disorder, I can't address whether that would get worse or not. I'm certain it won't go away." (T. Tx. p. 73-74).

6.      She needs constant monitoring. The seizures can be a life-threatening emergency. "Periodically, she will have what we call generalized tonic-clonic seizures which are really intense and sometimes long. I think she has had them as long as 20 minutes where the whole body is convulsing. They can't breathe, so they get low oxygen. And those are potentially life-threatening." Because she cannot cough, her respiratory problems can be life-threatening. (T. Tx. p. 74-75). She is threatened with skin, bladder and kidney infections. (T. Tx. p. 75). "She has a lot of things that have to be monitored as I mentioned earlier, and a lot of interventions have to be done both -- she is on -- in 2006 in particular she was on a very complex medical regimen that was changing frequently. And it took an alert, skilled person to keep up with just the medications, administer them properly. It's easy when you are dealing with 25

medications and you are measuring them out and there are all these bottles, it's easy to make a mistake for anybody. So you need somebody who is alert and skilled and very conscientious to administer medicines.  Dealing with her flexion contractures, that needs daily, multiple-times-a-day physical therapy, stretching, braces on, off. You can't leave braces on too long or you get skin breakdown. Turning, repositioning -- there's a lot of interventions. For her lung, she has a vest that we can zip on her that vibrates hard and sort of stimulates cough and movement of lung secretions. That has to be done."  (T. Tx. p. 75-76).  "She needs somebody with a level of skill watching her, observing her 24 hours."  (T. Tx. p. 77).  In July 2006 she had 94 hours a week of skilled in-home nursing care.  Joint Exhibit 5 "is a letter I wrote on October 1st, 2006, regarding Anna Callie Moore and her medical problems and the care she needed; and at that time I requested 94 hours [per week] which is what I had thought."  (T. Tx. p. 76-77).  Her caregivers must be alert, attentive and conscientious.  They "would need to be skilled in how to administer feedings, medications, do her physical therapy, apply her braces, turning her, changing her, none of which is easy as changing ourselves. I mean, you know, she can't cooperate. She has contractures and stuff.  And then they'd need to be able to assess her status, her bladder, her breathing. They'd need to be able to assess when a seizure needed intervention such as stat medication to stop it, medication given as soon as possible to stop it, those types of

things." (T. Tx. p. 78).  Early intervention by the nurses helps avoid hospitalizations. (T. Tx. p. 82).

7.   Dr. Braucher testified that Callie "needs continuous care provided by skilled people, whether it's the nurses or a highly-trained -- in her case, the only other person who could provide her care is her mother." (T. Tx. p. 83).  "Well, Callie's care is really a continuous stream of isolated tasks, some of which do not necessarily require an L.P.N. or R.N. but many of which do require an L.P.N. or R.N. But it's a continuous flow of tasks all day long and night." (T. Tx. p. 96).  There are limits to how much care the mother can provide.  "Well, unfortunately, her mother has to work to be able to provide income for Callie and her and other things; so her mother has to work. Then her mother has to sleep, and she probably needs a couple of hours a week where she can go to the store or something like that. So during that time, she wouldn't be able to provide care." (T. Tx. p. 83-84).  Callie's father was not available as a skilled caregiver.  In 2006, there were no other family members available to provide skilled care for Callie.  (T. Tx. p. 94-95).

8.   Katie Hemphill is a licensed practical nurse. (T. Tx. p. 17).  In 2006, she provided care for Callie two days per week.  (T. Tx. p. 19).  Joint Exhibit 7 is the home health certification and plan of care for September 21, 2006 through November 19, 2006.  It lists the 25 medications that Callie takes.  She is familiar with the

medications and their interactions.  Administering medications to Callie is a skilled task.  "Callie has a G-tube, and the medications are administered through that. So they have to be crushed and diluted, then you have to flush the tube to give the medications, flush afterwards. But before you administer anything, you have to pull back to make sure that you have stomach secretions and push forward to listen for placement."  (T. Tx. p. 20-21).  Ms. Hemphill testified with respect to the indications for each of the 25 medications.  (T. Tx. p. 21-31).  Because Callie cannot manage her secretions she has to be suctioned.  "We have a canister set that has a motor that has an extension tube. And depending on, you know, if it's further back or if it's in the mouth, what kind of instrument you use on the end of it, and you have to just -- it sucks out everything that's in her throat. And it'll -- it's scary for her, but it will usually trigger a huge cough. And you have to make sure that you don't have the cannula, you know, where she is going to bite it or it's going to scratch her throat or – because she is going to -- if she coughs, she is going to flail her head."  (T. Tx. p. 31-32).

9.    Periodic assessments are an important component of caring for Callie. "In any patient when you first receive them, you do a full head-to-toe assessment and then continuously throughout the day. It can -- the first thing you do is listen to their breath sounds, bowel sounds, make sure that they are not -- they don't have any edema, make sure their heart is regular, that it's, you know, not racing, rate and

rhythm. Her O2 saturation level, we want to check that. And then just a basic inspection just head to toe." (T. Tx. p. 32). Caring for Callie involves continuous assessments of her condition. For example, with her seizures "[y]ou just have to really see what's going on. And if the seizures are hard and there was a cluster, then, yes, I would want to administer [Valium]. But if the seizures were very light, then I wouldn't -- I would see if she could handle it." (T. Tx. p. 24). Her oxygen saturation levels and breath sounds must be checked frequently. (T. Tx. p. 35). She must be given enemas when she is constipated. (T. Tx. p. 36). Her G-tube site must be cleaned and maintained. The tube must be replaced. (T. Tx. p. 37-38). If her position is not change frequently, her skin will break down and cause bed sores. Her incontinence causes problems for skin care. (T. Tx. p. 38 ). Plaintiff's Exhibit 3 is a schedule that the mother put together of all the things that have to be done for Callie. (T. Tx. p. 47). She has stertor which is like a sudden snore. She cannot stop it and flails her head back. This stops her from breathing and she panics. She may have a seizure. (T. Tx. p. 48). In 2006, Ms. Hemphill accompanied Callie to school three or four days a week for about four hours each day. (T. Tx. p. 50-51). She had to take a lot of stuff to school to deal with Callie's medical problems. (T. Tx. p. 51). She never sleeps or naps while she is working a nursing shift for Callie. (T. Tx. p. 59). I was impressed by Ms. Hemphill's professionalism. She was a very credible witness.

10.     Pamela Moore testified that she can communicate with Callie but that it is difficult.  (T. Tx. p. 98-100).  Her interaction with her daughter is different if one of the nurses is there.  "If a nurse is there and I don't have to be on alert for everything that can happen with Callie, then we talk and we -- you know, we -- I brush her hair. We do girly things. We talk about school. We talk about Justin. We talk about, you know, things she wants to do for the weekend, for her future, other family members. We pray together. We do the things that mothers and daughters do."  (T. Tx. p. 102). When she is taking care of Callie by herself it is very busy.  "And I don't -- because there's always something that has to be done. It's either change a position or, you know, get a medicine or check medicine or order medicine or pick up medicine or, you know, the day-to-day things that have to be done to keep her alive just consume our day. And I try to -- you know, I try to squeeze in the mom stuff when I can; but it's hard because it's like I have to split my brain between, you know, doing these things that have to be done to keep her safe and doing these other things that I would be doing if all those medical facts weren't a part of our life." (T. Tx. p. 103-104). There are things that she cannot do such as listening to her lungs or bowel sounds.  (T. Tx. p. 104).  She has a hard time trying to suction Callie.  (T. Tx. p. 105).  When there is no night shift nurse she lies in a day bed next to Callie.  She tries to stay awake but she always falls asleep.  (T. Tx. p. 108).  She wakes up and has panic attacks because

she imagines that Callie is dead because of something that she did not do.  (T. Tx. p.

109-110 ).  She thinks that Callie will die if she gets less help.  (T. Tx.  p. 110).  "I get

tired and I get -- I get confused about things or I make bad decisions that hurt her; but

there's a nurse coming in that helps, you know, get things back on track."  (T. Tx. p.

110).  Pamela Moore has no social life.  She is unable to care adequately for her own

health needs.  (T. Tx. p. 111).  Callie had spinal fusion surgery in 2005.  After that,

she started going to school regularly.  (T. Tx. p. 113).  Reducing her nursing hours by

ten hours a week would be a huge difference.  "I mean, taking care of Callie is very,

very hard work. It's -- it is -- and I'm not even talking about the part that I was

struggling with earlier today, the emotional part of it, the just wanting to be the mother

part of it. Just the physical, the task part of it is hard work. I have an older daughter;

and I know what it's like to get a child, a 12-year-old ready to do something. And it's

not the easiest thing in the world. But it's nothing compared to a child who can't talk

to you, can't sit, can't stand, can't hold her own head up, can't even clear her own

throat if it gets congested. And she's heavy. I mean, she has to be lifted and moved and

it's -- it is physically exhausting. So ten more hours of the nurse being there is ten

more hours of physical work and psychological work that I'm not doing. It's a huge

difference."  (T. Tx. p. 116-117).  The reasons given for reducing her nursing hours

did not make any sense to her. (T.  Tx. p. 118-121).  She signed her former husband's

name to the GAPP paperwork indicating that he was a secondary caregiver even though he was not involved in taking care of Callie.  (T. Tx. p. 123).  Plaintiff's Exhibit 4 from Callie's GAPP file which indicates that Johnny Moore was a competent and available caregiver is completely fictitious.  (T. Tx. p. 124-125).  In 2006, her family had totally disintegrated.  (T. Tx. p. 149).

11.    Pamela Moore is a teacher.  (T. Tx. p. 129).  She resigned after Callie had her MRI which indicated severe brain damage.  (T. Tx. p. 130).  In 2006, she was working for the local school system as the parent mentor for families with children in special education programs.  (T. Tx. p. 130).  She is paid to work 20 hours but frequently works more.  (T. Tx. p. 131-132).  She does not believe that she is competent to suction Callie because she does not know whether she is doing it right. (T. Tx. p. 142).  She cannot take Callie's heart rate.  (T. Tx. p. 142).  She does not give Callie range of motion exercises because it hurts her and there is too much else to do.  The nurses do range of motion exercises because the doctor orders it.  (T. Tx. p. 159 ).  The night nurse was generally there from 11pm to 7am so that Pamela Moore could sleep.  The other hours were divided up during the day depending upon what was going on.  (T. Tx. p. 153-154).  Usually on Sundays there would be a night nurse and Pamela Moore was responsible for the other 16 hours.  (T. Tx. p. 154). Pamela Moore was an extremely credible witness.

12.     Dr. Charmaine Heard was the medical director of the Department of Community Health from 2000 to 2005.  (T. Tx. p. 168-169).  In 2003, the Georgia Medical Care Foundation ("GMCF") began providing services to the Department.  (T. Tx. p. 170-171).  She expected GMCF to make decisions consistent with GAPP and Department policy.  (T. Tx. p. 188).  Dr. Heard's testimony is entitled to little weight because she was so vague and non-responsive to counsel's questions.

13.     Miriam Henderson was employed as a program specialist at the Department of Community Health from 1998 until she retired in 2010.  (T. Tx. p. 201).  She was responsible for policy under the GAPP program after GMCF took over responsibility for case management.  (T. Tx. p. 202).  The GAPP program provided skilled nursing services to medically fragile children on a continuous basis.  (T. Tx. p. 205-206).  GAPP was a teaching program to train parents and other caregivers how to care for the children.  (T. Tx. p. 207-208).  Children in the GAPP program were supposed to have two caregivers.  (T. Tx. p. 208).  No one was ever terminated from the program for not having two caregivers.  Many parents did not have a second caregiver.  (T. Tx. p. 208-209).  When GMCF began assuming responsibility for case management there were meetings between the Department and the medical director and nurses from GMCF.  (T. Tx. p. 210-211).  The meeting minutes would summarize what was discussed and identify follow up issues.  (T. Tx. p. 215).  Plaintiff's Exhibit

2 is the GAPP Manual which set forth the guidelines for the GAPP program. (T. Tx. p. 225). Plaintiff's Exhibit 10 is meeting minutes talking about the weaning goals of the GAPP program. (T. Tx. p. 230). When asked about the weaning goals, Ms. Henderson testified: "Well, according to what we were doing, we had to make the determination as to whether the child met skilled level of care and whether the hours were still needed that were allocated to the child and based on the medical condition of the child were they still needed. And if not, they would be reduced." Parental competency "played a large role in the weaning schedule, yes. But they also took into consideration what the parents -- if they were working, if they needed travel time. They took all that into consideration." (T. Tx. p. 230-231). Part of the GAPP program was to wean down to the needed hours. (T. Tx. p. 233). Ms. Henderson was a credible witness.

14.   The Plaintiff introduced GAPP meeting minutes from 2003 through 2006. At the GAPP meeting in April 2003, DCH discussed the transition of the GAPP program from DCH to GMCF. The weekly GAPP Medical Review Team meetings were discussed. The nurses on the team complete a case document review and then make recommendations to the medical director. Final decisions of the team are a group process. Also discussed was the importance of maintaining the weaning schedule. (T. Tx. P. Ex. 7 ). In the June, 2003 GAPP meeting, DCH and GMCF

discussed "Review Guidelines" for the program. These Guidelines included tapering schedules. Nursing hours were to be reduced following the suggested schedule. The Guidelines directed that all cases will eventually be tapered. The Guidelines state the goal of the tapering schedules is that all cases will eventually be weaned off the program if possible. For children seeking renewals of nursing hours where there was no change in condition, GMCF was to either decrease skilled nursing hours or keep skilled nursing hours at the same level. The Guidelines provided that GMCF could assign 50 hours of skilled nursing per week for 6 months if one parent is working and one parent is home. If both parents work or one parent works and the secondary back-up caregiver is not in the home, GMCF can assign 56 hours of skilled nursing per week for 6 months. According to the renewal guidelines, the goal is to decrease skilled nursing to 40 hours per week or less and eventually wean the child off of the program if possible. (T. Tx. P. Ex. 8). In the August, 2005 GAPP meeting, the medical directors of DCH and GMCF discussed the need to contact physicians to retrain them on the GAPP program goal of weaning the children off of the program once the parents are trained caregivers. (T. Tx. P. Ex. 9). In the April, 2006 GAPP meeting, GMCF's medical director, Dr. Rosenfeld, requested information on the weaning goals of the program. DCH stated the goal of the program is to wean down to only needed hours but not to wean off program unless no skilled needs "due to

EPSDT requirements." Dr. Rosenfeld indicated that weaning education is needed for physicians, providers, and hospital discharge planners as it appears that there is a conflict of interest since physicians want to maintain good relationships with the parents and the providers want to make money for business reasons, therefore, children are not weaned when they possibly could be. Dr. Rosenfeld believed this to be the case because he had bowed to pressure to keep a patient's family happy. Also discussed was the requirement that each child must have a secondary caregiver, and if no secondary caregiver is available, GMCF was to notify the legal staff at DCH. (T. Tx. P. Ex. 10). In the June, 2006 GAPP meeting, DCH clarified the overall program goal "to wean down the needed hours but not wean off the program unless no skilled needs are identified." (T. Tx. P. Ex. 11 ).

15.     GAPP has a policy manual. The GAPP manual is updated every four months. The version of the GAPP manual in effect at time of the decision to reduce Callie's nursing hours was entitled "PART II, POLICIES AND PROCEDURES FOR THE GEORGIA PEDIATRIC PROGRAM (GAPP)," and dated October 1, 2006. (T. Tx. P. Ex. 2). GAPP policy requires that a cost analysis should be made to determine that the cost of caring for the child in the home and community is below the cost of providing the same care in an institution. (T. Tx. P. Ex. 2, § 701). GAPP policies require the primary caregiver to assist with the child's care in the home. (T. Tx. P. Ex.

2, §702.2(B)).  The child must have available primary and secondary caregivers to actively participate in her care.  (T. Tx. P. Ex. 2, §702.2(C)).  The child must need a specified time-limited period of daily continued nursing care, supervision and monitoring.  Hours of nursing may be reduced based upon an evaluation of the current medical plan of treatment, updated physician summaries, provider agency documented current assessments and nursing care.  (T. Tx. P. Ex. 2, §702.2(D)). GAPP provides that skilled nursing care services may be reduced when the medical condition of the child stabilizes to give more of the responsibility of the care of the child to the parents or caregivers.  One of the goals of the GAPP program is to teach the parents and caregivers how to care for the member in the absence of a nurse.  GAPP is not intended to be a permanent solution to skilled care.  It is a teaching program. (T. Tx. P. Ex. 2, § 803(C)).

16.    In a letter entitled "Appendix M, Letter of Notification of Approved Skilled Nursing Hours," dated November 15, 2006, Pamela Moore was notified that Callie's nursing hours would be reduced from 94 hours per week to 84 hours per week of nursing services. The letter was signed by Anna Baynes, R.N., GHPGMCF Staff Member.  (T. Tx. J. Ex. 1).  The Letter of Notification stated the reason for the reduction was "Skilled nursing hours may be reduced over time based on the medical

need of the member."  Additionally, the letter cited four policies from the GAPP

manual to support the reduction:

> Chapter 701: The cost analysis should be made to determine that the cost of caring for the member in the home & community is below cost of providing the same care in an institution.

> Chapter 702.2 part b: The primary caregiver must assist with the member's care in the home.

> Chapter 702.2 C: The availability and ability of the caregiver(s) or significant other to actively participate in the care of the member.

> Chapter 702.2 E: The expectation that the primary caregiver(s) will become competent to assume some responsibility to care for the child.

(T. Tx. J. Ex. 1).  These reasons make no sense in terms of Callie's actual condition,

the care that Pamela Moore was actually providing and the absence of any others to

care for the child.

17.     Dr. Joseph Rosenfeld testified on behalf of the Defendant. Dr. Rosenfeld

is a board certified pediatrician.  (T. Tx. p. 251).  He was the GMCF medical director

for the GAPP program from December of 2005 to November of 2011.  (T. Tx. p.

251).  He worked at GMCF one day a week.  (T. Tx. p. 281).  He was responsible for

the medical necessity reviews.  (T. Tx. p. 251-252).  "It was a team approach. We had

anywhere from two to three nurses who did all the basic work reviewing all the

materials, you know, five days a week. And then they would present me a summary

of the materials for each case. We'd discuss it as a team and then make a decision on the appropriateness of the hours." (T. Tx. p. 251-252 ). The nurses put together a "summary sheet" that was presented to him. (T. Tx. p. 252-253). The nurses summarized the records for him. (T. Tx. p. 281-282). In Callie's case, he reviewed the letter from Dr. Braucher in the fall of 2006. (T. Tx. p. 254). He did not disagree with any of Dr. Braucher's diagnoses. (T. Tx. p. 292). He reviewed the letters that GMCF received from Dr. Braucher in 2006 and 2007. "Well, you look at the letters. They're very, very similar or almost identical. But each letter has a different number of hours requested by Dr. Braucher and so there's not in evidence the letters to support the change in the number of hours needed for that time frame for Annie Callie Moore." (T. Tx. p. 264). It was his opinion and the team's opinion that Callie needed 12 hours of skilled nursing care seven days a week and the primary and secondary caregiver for the rest of the day. (T. Tx. p. 265, 289). His opinion "was based upon medical necessity and the number of hours this child had already been receiving." (T. Tx. p. 266). He would not recommend reducing nursing hours that were medically necessary "unless the child was showing signs of significant improvement in their condition." (T. Tx. p. 268). The only thing that he knows about Callie in November of 2006 were the summaries presented to him by the nurses. (T. Tx. p. 287). The only documentation of the decision to reduce Callie's nursing hours would have been

prepared by one of the nurses. (T. Tx. p. 273-274, 295). If the hours were decreased, a letter would be sent to the parents. (T. Tx. p. 274). He assumes that a letter was sent to Callie's mother. (T. Tx. p. 282-283). He has no knowledge of what was in the letter that was sent in November of 2006 to Pamela Moore. (T. Tx. p. 274, 282-283). He has never seen Joint Exhibit 1. (T. Tx. p. 298). Dr. Rosenfeld has no specific recollection of the meeting where the decision was made to reduce Callie's nursing hours. (T. Tx. p. 283). Dr. Rosenfeld made no notes of the reasons for the decision to reduce Callie's nursing hours. (T. Tx. p. 282). He agrees that Callie is medically fragile and needs skilled nursing care. (T. Tx. p. 288). His recommendation to reduce her nursing care hours was based upon the assumption that she had a secondary caregiver. (T. Tx. p. 301-302). There was no improvement in Callie's condition that lead to the decision to reduce her hours. (T. Tx. p. 302). There was no change in Pamela Moore's competence to provide skilled care to Callie. (T. Tx. p. 302).

18.     When Dr. Rosenfeld performed medical reviews, he applied the policies of the GAPP program. (T. Tx. p. 275). In November of 2005, Dr. Rosenfeld sat in on four or five meetings that were two and a half hours long to get oriented to the GAPP program. (T. Tx. p. 277). He read through the GAPP manual. (T. Tx. p. 278). He knew that GAPP was a teaching program. (T. Tx. p. 279). It was a weaning program so that hours could be reduced as parents became competent in the care of

their child.  (T. Tx. p. 280).  He has talked to pediatricians about why their requests were inappropriate.  (T. Tx. p. 285).  He applied GAPP policies and his own medical experience in the decision to reduce Callie's nursing hours.  (T. Tx. p. 283).  Once a child is stable with no new conditions and no new hospitalizations and the parents are competent caregivers he can start weaning the child's nursing care hours.  (T. Tx. p. 291).

19.     Dr. Braucher's opinion as to medically necessary hours of skilled nursing care is entitled to much greater weight than that of Dr. Rosenfeld.  Dr. Braucher has been treating this child virtually since she was born.  Dr. Rosenfeld reviewed her case on one occasion and based his decision upon summaries of her records.  He did not review her actual medical records.  The summaries were not produced and there is no way for me to determine whether they were accurate or complete.  His testimony that Dr. Braucher changed the requested hours many times with no explanation is incorrect.  For whatever reason, he did not testify at trial as to the opinions relied upon by the Court of Appeals with respect to the deficiencies of Dr. Braucher's letter. Indeed, little, if any, of the deposition testimony of Dr. Rosenfeld was repeated at trial. Dr. Braucher's opinion as to medically necessary hours was based upon his actual knowledge of what was going on in the child's home and what care was available.  Dr. Rosenfeld's assumption that a secondary caretaker was available is incorrect.  Dr.

Braucher's trial testimony is supported by voluminous medical records. Dr. Rosenfeld has no contemporaneous documents to support his trial testimony. Dr. Rosenfeld did not define his opinion as to medical necessity with any reference to Callie's condition or available caregivers in November of 2006. I have no reason to question Dr. Rosenfeld's honesty or integrity. I simply reject his opinion and testimony that the reduction in hours in November of 2006 was based upon medical necessity.

20.     Reducing her skilled nursing care by 10 hours a week would deprive Callie of essential services necessary to maintain her life and health. Pamela Moore cannot assume another 1.4 hours per day of unassisted care for Callie. In October of 2006, she was doing all that she could do to care for Callie.

21.     Five years have passed since this litigation began. Callie is now seventeen years old. From my observation of her in the courtroom, her condition has not improved and may have gotten worse. She has received 94 hours per week of skilled nursing care while this litigation has continued. The Plaintiff's claim for injunctive relief as to her future care must be based upon her current condition and not her condition in the fall of 2006. That claim is moot.

## II. <u>Conclusions of Law</u>

Congress enacted the Medicaid Act in 1965 with the aim of providing medical care for the nation's poorest and most vulnerable people. Medicaid is a cooperative

venture of the state and federal governments through which states that elect to participate receive federal financial assistance to furnish medical assistance to eligible people with low incomes.  The law that I will apply in this case is set out in the opinion of the Court of Appeals for the Eleventh Circuit in the appeal of my second Order granting summary judgment in favor of the Plaintiff.  <u>Moore ex rel. Moore v. Reese</u>, 637 F.3d 1220 (11th Cir. 2011) ("<u>Moore II</u>").  I will not repeat the lengthy discussion of the Medicaid Act and Regulations and the history of the EPSDT program.  And I will not repeat the discussion of the court precedents.

Near the end of the opinion, the Court of Appeals summarized the guiding principles to be applied to the case.  They are as follows.  (1) Georgia is required to provide private duty nursing services to Callie Moore, who meets the EPSDT eligibility requirements, when such services are medically necessary to correct or ameliorate her illness and condition.  (2) A state Medicaid plan must include reasonable standards  for determining eligibility for and the extent of medical assistance—here, the extent of private duty nursing services for Callie Moore—and such standards must be consistent with the objectives of the Medicaid Act, specifically its EPSDT program.  (3)  A state may adopt a definition of medical necessity that places limits on a physician's discretion. A state may also limit required Medicaid services based upon its judgment of degree of medical necessity so long as such

limitations do not discriminate on the basis of the kind of medical condition. Furthermore, a state may establish standards for individual physicians to use in determining what services are appropriate in a particular case and a treating physician is required to operate within such reasonable limitations as the state may impose. (4) The treating physician assumes the primary responsibility of determining what treatment should be made available to his patients. Both the treating physician and the state have roles to play, however, and a private physician's word on medical necessity is not dispositive. (5) A state may establish the amount, duration, and scope of private duty nursing services provided under the required EPSDT benefit. The state is not required to provide medically unnecessary, albeit desirable, EPSDT services. However, a state's provision of a required EPSDT benefit, such as private duty nursing services, must be sufficient in amount, duration, and scope to reasonably achieve its purpose. (6) A state may place appropriate limits on a service based on such criteria as medical necessity. In so doing, a state can review the medical necessity of treatment prescribed by a doctor on a case-by-case basis, and may present its own evidence of medical necessity in disputes between the state and Medicaid patients. Id. at 1255.

The Court of Appeals concluded:

> So, the pivotal issue is only whether 84 hours are sufficient in amount to reasonably achieve the purposes of private duty nursing services to correct or ameliorate Moore's condition. In this regard, the inquiry hinges on whether DCH -- in exercising its ability to "place appropriate limits

on a service based on such criteria as medical necessity," --fulfilled or
breached its concomitant duty to ensure that Moore's private duty
nursing care is "sufficient in amount, duration, and scope to reasonably
achieve its purpose."

Id. at 1257-58.

The Plaintiff has met her burden to establish by a preponderance of the
evidence that 94 private duty nursing hours, not 84 hours, are medically necessary.
First, the evidence is clear that Callie is a medically fragile child who requires skilled
care 24 hours a day 7 days a week. Dr. Rosenfeld's characterization of her in his
deposition as "chronically stable" is clearly erroneous. Callie is chronically unstable.
Her medical condition was not stable in 2006. In fact, that was a bad year for her with
at least two hospitalizations. Second, Dr. Braucher's opinion as to medical necessity
is entitled to much greater weight than that of Dr. Rosenfeld. Third, I am convinced
that the real reason for reducing Callie's nursing care hours was an unreasonable
application of the GAPP policy to wean nursing care and shift more of the burden to
her caregiver. Application of that policy to Callie was unreasonable because her
condition was not improving and her mother's competency to provide skilled care had
not increased. The reasons given in Joint Exhibit 1 for the reduction in nursing hours
are bureaucratic gobbledegook having no relation to her actual condition or needs.
The reduction in hours was arbitrary and capricious and was not based upon medical
necessity. In conclusion, 84 hours are not sufficient in amount to reasonably achieve

the purposes of private duty nursing services to correct or ameliorate Callie's condition.  Georgia has breached its duty to ensure that Callie's private duty nursing care is sufficient in amount, duration, and scope to reasonably achieve its purpose.

## III.  Conclusion

For the reasons set forth above, the Plaintiff is entitled to a declaratory judgment that the reduction of her skilled nursing hours from 94 per week to 84 per week was a violation of the Medicaid Act enforceable under 42 U. S. C. § 1983. Because five years have passed during the litigation of this case and the trial was limited to Callie's condition in 2006, the request for injunctive relief is moot and is denied.  The parties are directed to confer and attempt to present an agreed upon final judgment.

SO ORDERED, this 19 day of April, 2012.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge